**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

National Association of Convenience Stores
1600 Duke Street, 7th Floor
Alexandria, VA 22314

National Retail Federation
1101 New York Ave N.W., Suite 1200
Washington, DC 20005

Retail Litigation Center, Inc.
99 M Street S.E., Suite 700
Washington, DC 20003

Food Marketplace, Inc. d/b/a FMI – The Food Industry Association
251 18th St. S, Suite 1200
Arlington, VA 22202

Restaurant Law Center
2055 L Street N.W., Suite 700
Washington, DC 20036

National Grocers Association
601 Pennsylvania Ave, N.W. Suite 375N
Washington DC 20004

Illinois Retail Merchants Association
216 Broadway
Springfield, IL 62701

Illinois Fuel & Retail Association
112 W. Cook St.
Springfield, IL 62704

Illinois Restaurant Association
33 W. Monroe, Suite 250
Chicago, IL 60603

*Plaintiffs*,

v.

Jonathan V. Gould, *in his official capacity as Comptroller of the Currency*; Rodney E.

Civil Action No. __________

Hood, *in his official capacity as First Deputy Comptroller of the Currency*; Arianne C. Minks, *in her official capacity as Acting Chief of Staff of the Comptroller of the Currency*; and Office of the Comptroller of the Currency
400 7th Street S.W.
Washington, DC 20219

*Defendants*.

**COMPLAINT**

1. Every time a consumer pays a merchant with a Visa or Mastercard, the merchant is charged a fee (called an interchange fee) that is set by the credit card network and received by the bank issuing the card. Interchange fees in the United States are the highest in the world, often 10 times the fees in Europe. Most of the interchange fee is set as a percentage of the overall transaction amount. These fees cost merchants hundreds of billions of dollars a year, and they inflate the retail prices that consumers pay. After Illinois passed a law prohibiting card networks from establishing an interchange fee on the tax and gratuity portion of a transaction—amounts that merchants collect on behalf of and fully pass on to others—banking interests challenged the law as preempted by the National Bank Act. A federal district court rejected that challenge. Years into the litigation, the Office of the Comptroller of the Currency ("OCC") promulgated an interim final rule and interim final order purporting to change that outcome.

2. Plaintiffs, National Association of Convenience Stores, National Retail Federation, Retail Litigation Center, Food Marketplace, Inc. d/b/a FMI – The Food Industry Association, Restaurant Law Center, National Grocers Association, Illinois Retail Merchants Association, Illinois Fuel & Retail Association, and Illinois Restaurant Association (collectively, "Plaintiffs") challenge the interim final rule issued by Defendant OCC, titled National Bank Non-Interest Charges and Fees, 91 Fed. Reg. 22,989 (Apr. 29, 2026) ("Interim Rule"). OCC issued the Interim Rule

without notice and comment, claiming that doing so would be "impracticable" because of the Illinois law enacted years earlier. The Interim Rule purports to determine that the National Bank Act protects national banks' ability to receive interchange fees established by payment card networks, even when those fees are set centrally and non-competitively by the networks rather than by the banks themselves, are charged to merchants and not bank customers, and are much higher than the amount necessary to compensate banks for their highly profitable credit card practices. But nothing in the National Bank Act—or in the OCC's poorly reasoned, slapdash rule—authorizes such collusive and excessive fees on merchants that are not being provided banking services in exchange for those fees.

3. Plaintiffs also challenge the accompanying interim final order issued by Defendant OCC titled Order Preempting the Illinois Interchange Fee Prohibition Act, 91 Fed. Reg. 23,150 (Apr. 29, 2026) ("Interim Order"), which purports to preempt the Illinois Interchange Fee Prohibition Act, 815 ILCS 151/150-1 *et seq.* ("IFPA"). The Interim Rule and Interim Order purport to render the IFPA unenforceable, meaning merchants (including Plaintiffs and their members) and consumers will be charged hundreds of millions of dollars more in interchange fees on state taxes and tips. Like the Interim Rule, the Interim Order skipped over the notice-and-comment procedures required by the Administrative Procedure Act and the National Bank Act. And nothing in that Act grants OCC the power to preempt the IFPA, a law regulating the business of credit card networks.

4. Visa and Mastercard require merchants to accept cards from every financial institution if they accept cards from any institution in the network. Given that over eighty percent of all card transactions occur on one of these two networks, merchants have little choice but to accept every Visa and Mastercard, no matter how high an interchange fee any institution on those net-

works imposes. Financial institutions simply adopt the default fees set by the card networks. Merchants even must pay these high fees on taxes and tips—amounts merchants collect on behalf of, and pass on completely to, others (*i.e.*, their employees and the government). In other words, the merchants pay fees for these portions of every transaction, even though they, of course, make no revenue from taxes or tips.

5. American consumers also bear those costs through higher retail prices, while card networks and issuing banks reap immense profits from the fees. In 2025 alone, the card networks and their issuing banks collected $198 billion in U.S. credit and debit card merchant fees, increasing costs to the average American family by an estimated additional $1,200 per year. *See* Bridget Goldschmidt, *Swipe Fees Reach Record $198.25B*, Progressive Grocer, March 19, 2026.

6. Against this backdrop, Illinois passed the IFPA in 2024 to try to redress one discrete, fundamentally unfair, aspect of the modern payments system—the collection of interchange fees on applicable taxes and tips. 815 ILCS 151/150-1 *et seq.* The IFPA eliminates this unfairness by prohibiting certain entities from "receiv[ing] or charg[ing] a merchant any interchange fee on the tax amount or gratuity of an electronic payment transaction." 815 ILCS 151/150-10(a). The IFPA's limitation applies only when a card network (as opposed to the card-issuing bank itself) sets the fee. 815 ILCS 151/150-5, -10(a). In contrast, if a bank were to set its own interchange fee amount on taxes and tips, it would be exempt from the IFPA interchange fee requirement. *See id.* In short, the IFPA targets the business of card networks rather than the business of banking.

7. The Illinois Bankers Association and several other financial institution associations ("the Banks") moved swiftly to try to enjoin the IFPA, arguing that the IFPA was preempted by the National Bank Act, 12 U.S.C. § 1 *et seq. See Ill. Bankers Ass'n et al. v. Raoul*, No. 1:24-cv-7307 (N.D. Ill.). OCC filed an amicus brief in support of the Banks. *Id.* Dkt. 60. The district court

denied the Banks' summary judgment motion and held that the National Bank Act did not preempt the IFPA. *Id.* Dkt. 179 ("*Raoul* MSJ Order"). At that time, the law was set to go into effect in July 2026.

8. The Banks appealed to the U.S. Court of Appeals for the Seventh Circuit and, on information and belief, urged the OCC to step in on their behalf. *See Ill. Bankers Ass'n v. Raoul*, No. 26-1354. OCC filed another amicus brief in support of the Banks in that court. *Id.* Dkt. 30. But OCC soon decided that its two amicus briefs for the Banks had constituted insufficient support.

9. Nearly two years after the enactment of the IFPA and just two months before its effective date, OCC, without notice, promulgated the Interim Rule and Interim Order to address the IFPA, claiming that notice and comment was "impracticable." 91 Fed. Reg. 22,992, 23,155-56. OCC then sent a letter under Federal Rule of Appellate Procedure 28(j) to the Seventh Circuit about its actions. *Ill. Bankers Ass'n v. Raoul*, No. 26-1354, Dkt. 84. The Seventh Circuit remanded the case for further consideration of OCC's actions, *id.* Dkt. 104, and the district court reversed its ruling and permanently enjoined enforcement of the IFPA as applied to national banks based on the Interim Rule and Interim Order, *Raoul*, No. 1:24-cv-7307 (N.D. Ill.) Dkt. 223 ("*Raoul* Perm. Inj. Order"). The Illinois General Assembly's effort to provide relief to merchants and consumers from paying interchange fees on taxes and tips remains enjoined today.[1]

10. The Interim Rule and Interim Order exceed OCC's authority under the National Bank Act and their reasoning is arbitrary and capricious, thus violating the Administrative Procedure Act. 5 U.S.C. § 706(2)(A), (C) (prohibiting agency actions that are "arbitrary, capricious, an

[1] The Illinois General Assembly initially set a July 1, 2025, effective date for the IFPA, but in June 2025 the General Assembly moved that date to July 1, 2026. *See* Illinois Public Act 104-4, § 5. Then, the IFPA was enjoined in the *Raoul* litigation. Afterwards, the General Assembly delayed implementation of the IFPA to July 1, 2027. *See* Illinois Public Act 104-0532.

abuse of discretion, or otherwise not in accordance with law" and those that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"). In addition, OCC promulgated the Interim Rule and Interim Order without observing the fundamental procedures required by law, and as such the Interim Rule and Interim Order violate the Administrative Procedure Act and the National Bank Act.

11. Plaintiffs respectfully ask this Court to declare that the Interim Rule and Interim Order violate the National Bank Act and the Administrative Procedure Act, and to vacate and set aside both actions.

**JURISDICTION AND VENUE**

12. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law. Specifically, Plaintiffs' claims arise under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA").

13. Venue is proper under 28 U.S.C. § 1391(e)(1) because an agency of the United States is a Defendant, that agency is based in Washington, D.C., and because, on information and belief, Defendants Jonathan V. Gould, Rodney E. Hood, and Arianne C. Minks perform their official duties in Washington, D.C. In addition, Plaintiffs National Retail Federation, Retail Litigation Center, Inc., Restaurant Law Center, and National Grocers Association all reside in Washington, D.C.

14. This Court is authorized to award the requested relief under 5 U.S.C. § 706; 28 U.S.C. §§ 1651, 2201, and 2202; and its inherent equitable powers.

15. Sovereign immunity is waived by statute. 5 U.S.C. § 702.

16. A party's "standing to seek review of administrative action is self-evident . . . if the complainant is an object of the action (or forgone action) at issue." *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002) (citation omitted).

17. Plaintiffs have exhausted all administrative remedies and have no other adequate remedy available at law.

## PARTIES

18. Plaintiff NATIONAL ASSOCIATION OF CONVENIENCE STORES ("NACS") is a trade association dedicated to advancing both the convenience and fuel retailing industries, including serving as a voice for its members on combatting unnecessary or unlawful costs such as inflated credit card swipe fees. Its members include over 1,300 retail merchants and over 1,600 suppliers, many of whom operate in the State of Illinois. The U.S. convenience store industry has more than 152,000 stores across the country selling fuel, food, and merchandise; they accept 160 million customer transactions daily and have annual sales of over $906 billion. Many of their sales are card purchases that are subject to tax and/or tips. NACS is bringing this action on its own behalf and on behalf of its members that are negatively impacted by the challenged Interim Rule and Interim Order.

19. Plaintiff NATIONAL RETAIL FEDERATION ("NRF") is a trade association whose members include over 17,000 merchants across the diverse retail industry, including department stores, restaurants, grocery stores, Internet retailers, and others. For over a century, NRF has been a voice for every retailer and every retail job, including advocating for swipe fee reform to increase transparency and reduce swipe fees for merchants. Among other things, NRF advocates for policies that will benefit the retail industry and provides a professional network for thousands of industry representatives. Many of NRF's members operate in the State of Illinois, and many of

their sales are card purchases that are subject to tax and/or tips. NRF is bringing this action on its own behalf and on behalf of its members that are negatively impacted by the challenged Interim Rule and Interim Order.

20. Plaintiff RETAIL LITIGATION CENTER, INC. is a trade association that represents national and regional retailers, including many of the country's largest and most innovative retailers, across a breadth of retail verticals. The Retail Litigation Center is dedicated to representing the retail industry in the courts, including on issues involving exorbitant, unlawful, and unreasonable swipe fees. The Retail Litigation Center members employ millions of people throughout the United States, provide goods and services to tens of millions more, and account for hundreds of billions of dollars in annual sales. The Retail Litigation Center offers retail-industry perspectives to courts on important legal issues and highlights the industry-wide consequences of significant cases. Many of the Retail Litigation Center's members operate in the State of Illinois, and many of their sales are card purchases that are subject to tax and/or tips. The Retail Litigation Center is bringing this action on its own behalf and on behalf of its members that are negatively impacted by the challenged Interim Rule and Interim Order.

21. Plaintiff Food Marketplace, Inc. d/b/a FMI – THE FOOD INDUSTRY ASSOCIATION, is a trade association representing members in the food industry across the entire consumer food supply chain—from the producers that supply food to the retailers that sell it. FMI's members range from small independent operators to the largest national and international food businesses. The reach of FMI's work is significant and represents a $1 trillion industry with over six million employees. Its members include over 40,000 retail food stores and 25,000 pharmacies. FMI advocates for policies in federal and state governments that will benefit the food industry, including on threats to the food industry such as soaring swipe fees. Many of FMI's members operate in the

State of Illinois, and many of their sales are card purchases that are subject to tax and/or tips. FMI is bringing this action on its own behalf and on behalf of its members that are negatively impacted by the challenged Interim Rule and Interim Order.

22. Plaintiff RESTAURANT LAW CENTER is the only independent public policy organization created specifically to represent the interests of the food service industry in the courts. The industry is comprised of over one million restaurants and other foodservice outlets that represent a broad and diverse group of owners and operators—from large national outfits and franchisors with hundreds of locations and billions in revenue, to small single-location, family-run neighborhood restaurants and bars, including restaurants in Illinois. It represents a labor-intensive industry employing about 16 million people, including locations in Illinois, and is the nation's second largest private-sector employer. Through amicus participation and first party litigation, the Restaurant Law Center serves as the industry's voice in the judicial system and offers courts and regulatory agencies the industry's perspective on significant legal and regulatory issues to ensure that the views of America's and state restaurant associations, including Illinois' restaurants, are taken into consideration. It advocates on behalf of its member organizations on a variety of topics, including on the topic of processing credit card transactions, which now is the third-largest operating expense, behind food and labor. Many sales are card purchases on payments that are subject to tax and/or tips, including for members in Illinois. The Restaurant Law Center is bringing this action on its own behalf and on behalf of its members that are negatively impacted by the challenged Interim Rule and Interim Order.

23. Plaintiff NATIONAL GROCERS ASSOCIATION is a national trade association. It represents the retail and wholesale grocers that comprise the independent sector of the food distribution industry, as well as affiliated associations, manufacturers, and service suppliers. Its

mission is to champion the independent grocery industry through advocacy, collaboration, education, services, and connections, including on topics like swipe fee costs for which small businesses like grocery stores pay almost double what large businesses pay, and which is their only cost that is non-negotiable. To that end, it offers advocacy, support, and resources to over 1,700 independent supermarket operators, including in the State of Illinois. Many of their sales are card purchases on payments that are subject to tax and/or tips. The National Grocers Association is bringing this action on its own behalf and on behalf of its members that are negatively impacted by the challenged Interim Rule and Interim Order.

24. Plaintiff ILLINOIS RETAIL MERCHANTS ASSOCIATION ("IRMA") represents Illinois retailers statewide and fights for the best possible environment in which to do business in Illinois. One out of every four people in Illinois works in the retail industry; retail thus serves as a driving force of Illinois's economy. IRMA provides advocacy services and representation to Illinois retailers and engages with retailers, the public, lawmakers, and the media on the impact of legislative and regulatory proposals on Illinois retail. IRMA has fought to reduce swipe fees, including on taxes and tips, and advocates against the duopoly of Visa and Mastercard that currently can raise these fees without oversight, harming consumers and retailers as they continue to grapple with inflation. IRMA worked with Illinois lawmakers to pass the IFPA. IRMA is bringing this action on its own behalf and on behalf of its members that are negatively impacted by the challenged Interim Rule and Interim Order.

25. Plaintiff ILLINOIS FUEL & RETAIL ASSOCIATION ("IFRA") is a trade association that serves as a voice for petroleum distributors and convenience store businesses in Illinois. IFRA is made up of businesses ranging from small family-run establishments to publicly traded international corporations, representing primarily petroleum marketers and convenience stores. Its

members sell over 10 billion gallons of fuel every year, for which its members are subject to over $2 billion in Illinois state fuel taxes alone. IFRA advocates for policies that will help its members and their customers, including advocating for the elimination of swipe fees on taxes and tips. Many of IFRA's members for whom IFRA advocates will continue to be injured by paying interchange fees on taxes and tips in the absence of the IFPA. IFRA is bringing this action on its own behalf and on behalf of its members that are negatively impacted by the challenged Interim Rule and Interim Order.

26. Plaintiff ILLINOIS RESTAURANT ASSOCIATION (“IRA”) is a non-profit trade organization founded over one hundred years ago to promote, educate, and improve the restaurant industry in Illinois. Headquartered in Chicago, the Association has nearly 8,000 participants statewide—including restaurant operators, food service professionals, suppliers, and related industry professionals—and represents the Illinois restaurant industry, which includes more than 25,000 owners and operators, and employs hundreds of thousands across the state. The Association supports the restaurant industry by promoting local tourism, providing food service education and training programs, providing analysis on topics of the day, providing networking opportunities, hosting culinary events, and advocating for members’ interests. Many of IRA’s members for whom IRA advocates will continue to be injured by paying interchange fees on taxes and tips in the absence of the IFPA. IRA is bringing this action on its own behalf and on behalf of its members that are negatively impacted by the challenged Interim Rule.

27. Plaintiffs and their members all accept Visa and Mastercard transactions since those card networks dominate credit and debit card payments in the United States. Merchants are required to pay interchange fees on Visa and Mastercard card transactions as a condition of accepting credit- and debit-card payments, and those fees are retained by the banks issuing credit and debit

cards. In 2025 alone, U.S. merchants paid more than $198 billion in swipe fees. J. Craig Shearman, *Credit and Debit Card 'Swipe' Fees Reach Record $198.25 Billion as President and Congress Call for Action*, Merchants Payments Coalition (Mar. 18, 2026), https://perma.cc/99LL-C65N. In the absence of the IFPA, merchants are forced to pay interchange fees on taxes and tips, for which they have no corresponding revenue, further increasing their overall card acceptance costs.

28. The IFPA would have provided a substantial benefit to Plaintiffs and their members because it would have relieved them of the burden of paying interchange fees on taxes and tips—to the tune of hundreds of millions of dollars. The Interim Order purports to preempt the IFPA based on the Interim Rule's revisions to OCC regulations. Thus, both OCC actions purport to empower banks to continue to receive hundreds of millions of dollars more in interchange fees in Illinois from Plaintiffs and their members.

29. The most recent estimate is that Illinois merchants pay upwards of $242 million in interchange fees on taxes and tips alone every year. Illinois Fuel & Retail Association, *Swipe Fees on Taxes and Tips – Methodology*, https://tinyurl.com/4mpzuwcx.

30. Plaintiffs also have a broader interest in their members not being charged excessive interchange fees established by non-bank payment card companies, including on funds that merchants collect but do not retain, such as taxes and tips, and in safeguarding the ability of States like Illinois to protect the interests of merchants and consumers from such economically harmful practices. The Interim Rule and Interim Order cast significant doubt on the ability of states like Illinois to pass legislation that relieves merchants and consumers of these substantial financial burdens and thus will chill other States from doing so.

31. OCC furthermore failed to follow procedures required by law when it issued the Interim Rule and Interim Order. OCC's failure to abide by those procedures deprived Plaintiffs

and their members of the procedural right to protect their interests through notice and comment. Because OCC elected to proceed without notice and comment, Plaintiffs lost their right to attempt to persuade the OCC to change course before it issued the Interim Rule and Interim Order. These procedural injuries would be redressed by the relief sought.

32. Defendant JONATHAN V. GOULD, the Comptroller of the Currency, is the highest-ranking member of the OCC. In that capacity, he has ultimate responsibility for the administration and implementation of the National Bank Act and compliance with the APA, and for compliance with all other federal laws applicable to OCC. The Comptroller is sued in his official capacity.

33. Defendant RODNEY E. HOOD is the First Deputy Comptroller of the Currency. The Interim Order and Interim Rule were both signed by "Katherine S. Tyrrell, First Deputy Comptroller of the Currency." The First Deputy Comptroller is sued in his official capacity.

34. Defendant ARIANNE C. MINKS, Acting Chief of Staff of the Comptroller of the Currency, manages the day-to-day operations of the OCC front office, oversees the agency's public and legislative affairs, and provides direct support to the Comptroller. Upon information and belief, Katherine S. Tyrrell served in this capacity when she signed the Interim Order and Interim Rule. The Acting Chief of Staff is sued in her official capacity.

35. Defendant OCC is an agency within the U.S. Department of the Treasury that promulgated the challenged actions.

## STATUTORY BACKGROUND

36. The Illinois Interchange Fee Prohibition Act ("IFPA"), 815 ILCS 151/150-1 *et seq.*, prohibits "any interchange fee on the tax amount or gratuity of an electronic payment transaction," 815 ILCS 151/150-10(a), that is "established, charged, or received by a payment card network," 815 ILCS 151/150-5.

37. The IFPA applies to all credit and debit card transactions in Illinois, without discriminating against national banks. It applies only to fees set by card networks, not to fees set by the card-issuing bank itself. It regulates fees imposed on merchants accepting card transactions; it does not regulate fees imposed by national banks on their customers. It regulates the choice by card networks, like Visa and Mastercard, to use their dominant market power to include in the interchange fee calculation the transaction amounts attributable to taxes and tips, which merchants have little choice but to accept because of the anticompetitive card network rules.

38. The National Bank Act, 12 U.S.C. § 1 *et seq.*, regulates a different set of activities. It does not authorize card networks to set interchange fees; rather, it grants certain powers to national banks, *id.* § 24, and creates the OCC to ensure the national banks' "safety and soundness," "compliance with laws and regulations," offer of "fair access to financial services," and offer of "fair treatment of customers," *id.* § 1(a).

39. The National Bank Act authorizes national banks to "loan[] money on personal security" and "receiv[e] deposits." 12 U.S.C. § 24. It does not say anything about receiving fees charged to entities that are not customers of the bank, *i.e.*, fees on persons that are not receiving loans or providing deposits to the bank. Nor does the National Bank Act empower banks to receive fees set by third parties as part of an arrangement that prevents any competition among banks on fees.

40. The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 amended the National Bank Act by establishing the applicable preemption standard for when a "State consumer financial law"[2] is preempted as to national banks. 12 U.S.C. § 25b. Under that

[2] A "State consumer financial law" is one "that directly and specifically regulates the manner, content, or terms and conditions of any financial transaction (as may be authorized for national

provision, the National Bank Act preempts State consumer financial laws "only if" the State law (a) "would have a discriminatory effect on national banks" relative to State-chartered banks, (b) "prevents or significantly interferes with the exercise by the national bank of *its* powers," or (c) is preempted elsewhere by federal law. 12 U.S.C. § 25b(b)(1) (emphasis added).

41. Whether a state consumer financial law "significantly interferes" with a national bank's exercise of "its powers" is analyzed under the standard laid out in *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25 (1996) and its progeny. 12 U.S.C. § 25b(b)(1). But the National Bank Act otherwise does "not deprive States of the power to regulate national banks." *Barnett Bank*, 517 U.S. at 33.

42. Courts following the *Barnett Bank* standard have upheld numerous state regulations on national banks, including regulations that would result in decreased bank revenue. For example, the U.S. Court of Appeals for the First Circuit held that the National Bank Act did not preempt a State law requiring banks to pay interest on mortgage-escrow accounts, because nothing in the National Bank Act "expressly prohibits state interest-on-escrow laws," and the banks "failed to demonstrate" that the requirement conflicted with "express banking power to make real estate loans" and their "incidental power to establish mortgage-escrow accounts," even if it impacted the banks' bottom line. *Conti v. Citizens Bank, N.A.*, 157 F.4th 10, 20, 28 (1st Cir. 2025). Similarly, the U.S. Court of Appeals for the Ninth Circuit upheld a state law requiring banks to pay interest on escrow accounts; the court acknowledged that the law "raises the cost to national banks to use escrow accounts and may discourage them from issuing and servicing loans," but that fact did not "compel" preemption. *Kivett v. Flagstar Bank, FSB*, 154 F.4th 640, 642, 648 (9th Cir. 2025).

---

banks to engage in), or any account related thereto, with respect to a consumer." 12 U.S.C. § 25b(a)(2).

43. The National Bank Act's preemption provision specifies that the Act "does not occupy the field in any area of State law." 12 U.S.C. § 25b(b)(4).

44. The Dodd-Frank Act also included a provision called the Durbin Amendment, which imposed federal limits on soaring debit card interchange fees. See Pub. L. No. 111-203, 124 Stat. 1376, 2068-74 (2010) (codified at 15 U.S.C. § 1693o-2. Importantly, the Durbin Amendment's federal caps on interchange fees did *not* eliminate state authority to protect consumers in this area. The Durbin Amendment is subject to a safe harbor providing that a "State law is not inconsistent with this subchapter if the protection such law affords any consumer is greater than the protection afforded by this subchapter." 15 U.S.C. § 1693q. Thus, when Congress enacted the Durbin Amendment's caps on debit interchange fees, it did so in a manner that left space for the states to provide even greater protections for consumers through their own interchange fee regulations.

45. To make a preemption determination under the National Bank Act, OCC must follow a series of procedures. Among other things, it may not determine that a state consumer financial law is preempted "unless substantial evidence, made on the record of the proceeding, supports the specific finding regarding the preemption of such provision[.]" 12 U.S.C. § 25b(c).

46. Similarly, before OCC may issue "any opinion letter or interpretive rule . . . that concludes that Federal law preempts the application to a national bank of any State law regarding community reinvestment, consumer protection, fair lending, or the establishment of intrastate branches," OCC must "publish in the Federal Register notice of the preemption or discrimination issue that the agency is considering," "give interested parties not less than 30 days in which to submit written comments," and "consider any comments received." 12 U.S.C. § 43(a).

47. The Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, also governs the substantive and procedural requirements for agency decision-making, including the rulemaking and adjudication process.

48. A court must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). That is because "[f]ederal agencies" are "creatures of statute and as such literally have no power to act except to the extent Congress authorized them." *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 911-12 (D.C. Cir. 2024) (cleaned up).

49. Under the APA, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted) ("*State Farm*"). A "reviewing court shall . . . hold unlawful and set aside" agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

50. An agency action is arbitrary and capricious under the APA where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

51. The APA requires that "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments" before it issues a rule. 5 U.S.C. § 553(c).

52. An agency may only dispense with the APA's notice and comment requirements in a rulemaking if it finds, "for good cause," that "notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). The impracticability exception is "to be narrowly construed and only reluctantly countenanced." *Mack Trucks, Inc. v. E.P.A.*, 682 F.3d 87, 93 (D.C. Cir. 2012). This exception applies only where, for example, delay would "imminently threaten life or physical property." *Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 706 (D.C. Cir. 2014).

53. The APA confers a right of judicial review on any person who is adversely affected by agency action. 5 U.S.C. § 702.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Card Networks Set Supracompetitive Interchange Fees

54. On every retail credit and debit card purchase involving a Visa or Mastercard-branded card, the card network company, Visa or Mastercard, centrally sets an interchange fee that is charged to merchants and collected by banks that issue the credit and debit cards. Whenever a customer pays a merchant with a credit or debit card, the customer's card information is sent through the card network to the customer's issuing bank, which approves or declines the purchase. Following approval, the card network moves the funds from the issuing bank to the merchant's bank to settle the sale, but the merchant does not receive the entire amount. Instead, every transaction incurs several fees, including an interchange fee. The issuing bank retains the interchange fee. The merchant then receives the purchase amount minus the fees. Thus, the merchant bears the interchange fee as part of the cost of accepting the transaction, while the fee is paid to the cardholder's issuing bank. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 1014159, at *4-*5 (E.D.N.Y. Mar. 8, 2024).

55. For merchants, many of whom operate on thin margins, interchange is a significant and unavoidable cost of accepting card payments, and that cost is ultimately reflected in the prices consumers pay. American consumers thus are stuck with the bill for the interchange fees while the issuing banks receive immense profits.

56. The card-issuing banks collect hundreds of billions of dollars annually from these interchange fees, increasing costs to the average American family by an estimated $1,200 per year. *See* Goldschmidt, *Swipe Fees Reach Record $198.25B*, *supra*.

57. Card networks like Visa and Mastercard, not banks, set the interchange fees and impose "network rules" that "work[] in tandem" to "allow the issuing banks to impose an artificially inflated interchange fee that merchants have little choice but to accept." *In re Payment Card Interchange Fee*, 827 F.3d 223, 228 (2d Cir. 2016). For example, the card networks' rules require merchants to take all cards from every bank in those respective brands regardless of interchange rate, leaving the networks "free to set interchange fees at a supra-competitive rate" and giving "the issuing banks[] little incentive to deviate from it." *Id.* at 228-29. Thus, the issuing banks do not set the interchange fees themselves, but instead accept any default fee set by the card networks, and then profit massively from the collusive deal that prevents any need for competition among the banks on merchant fees. The fee-setting by card networks combined with the requirement to take all cards deprives the payment card market of competition on price that is the hallmark of other markets in the United States.

58. The result is that interchange fees in the United States are among the highest in the world. In contrast to the 30-basis-point (0.30%) credit interchange cap in the European Union and the United Kingdom, where issuers still operate profitably, Visa and Mastercard typically set their United States credit interchange rates "between 200 and 300 basis points." *In re Payment Card*

*Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *28, *41 (E.D.N.Y. June 28, 2024) (citations omitted). American families then must foot the bill.

59. Every year, U.S. merchants pay hundreds of billions of dollars in these artificially inflated fees on debit and credit card transactions. In 2025 alone, credit and debit card merchant fees totaled over $198 billion. *See* Goldschmidt, *Swipe Fees Reach Record $198.25B*, *supra*. For many merchants, aggregate interchange fees exceed all operating costs except labor costs. *See* Merchants Payments Coalition, *Merchants Welcome Unions' Call to Pass Credit Card 'Swipe' Fee Reform* (Jan. 29, 2026), https://perma.cc/P5VR-L9S7. Merchants operating on thin margins cannot absorb these fees, so American consumers end up having to pay more while the issuing banks receive immense profits.

## II. IFPA's Enactment and Resulting Litigation

60. In June 2024, the State of Illinois enacted the Illinois Interchange Fee Prohibition Act, 815 ILCS 151/150-1 *et seq.* The IFPA prohibits any entity from charging "interchange fees" on the "tax amount or gratuity of an electronic payment transaction," 815 ILCS 151/150-10(a), but only when that interchange fee is "established, charged, or received by a payment card network," 815 ILCS § 151/150-5.[3] Although originally intended to go into effect in July 2025, the IFPA's effective date was subsequently delayed to July 1, 2026, and then to July 1, 2027, following OCC's disputed actions here.

61. Soon after the State passed the IFPA, the Banks sued the Attorney General of Illinois seeking to enjoin its enforcement. *Ill. Bankers Ass'n v. Raoul*, No. 1:24-cv-07307 (N.D. Ill.). The Banks argued that the National Bank Act preempted the IFPA. *See id.* Dkt. 1. The district

[3] The IFPA also contains a Data Usage Limitation provision. 815 ILCS 151/150-15(b). That provision is not relevant to this Complaint.

court initially granted a partial preliminary injunction. *Id.* Dkt. 104. But upon closer review, at summary judgment, the district court held that the National Bank Act did not preempt the IFPA and denied the Banks' motion for summary judgment. *Raoul* MSJ Order.

62. The district court explained that the National Bank Act did not preempt the IFPA because "banks do not set" the "interchange fees" in question, so the IFPA's "interchange fee provision[] does not directly regulate banks." *Raoul* MSJ Order at 12, 20-21. The fact that the IFPA regulated only network-set fees rather than bank-set fees made the case "unlike" the "Supreme Court precedents" that involved "direct interventions into banking operations." *Id.* at 13; *cf. Barnett Bank*, 517 U.S. 25 (1996) (holding that a federal law guaranteeing that national banks "may" sell insurance in small towns directly preempted a state law prohibiting banks from selling insurance in those towns). The district court held that no statute, regulation, or other source establishes that receiving anticompetitive interchange fees is part of the "business of banking." *Raoul* MSJ Order at 19-20.

63. In reaching that conclusion, the district court explicitly rejected the Banks' reliance on OCC regulations that, at the time, allowed a national bank to "charge its customers non-interest charges and fees," with fees "arrived at by each bank on a competitive basis and not on the basis of any agreement, arrangement, undertaking, understanding, or discussion with other banks or their officers." 12 C.F.R. § 7.4002(a), (b) (2025). The Banks argued that this regulation preempted the IFPA, but the court disagreed, explaining that under the Banks' "reasoning, national banks could shield a vast amount of their otherwise regulatable activities from State regulation by hiding behind third-party entities like the credit card companies," that the Banks' reliance on the regulation was "hard to square with a state law that impacts a fee that those same banks do not set and that are not keyed to their particular services," and that it was "even harder to say that type of fee-setting is

such a cornerstone of national banking power as to preempt all State intervention." *Raoul* MSJ Order at 21-23.

64. The Banks appealed the district court's denial of summary judgment. *See Ill. Bankers Ass'n v. Raoul*, No. 26-1354. Between March 2, 2026, and April 17, 2026, the Appellants, Appellees, and respective *amici*—including some of the Plaintiffs here, Dkt. 68, and OCC itself, Dkt. 30—filed opening, response, and reply briefs on the merits. *See id.* But before a decision by the Seventh Circuit, OCC filed a Rule 28(j) letter stating that it was promulgating an interim final rule and interim final order, both of which would have "significant effects on the questions presented" and would become effective "the day before the IFPA is set to become effective." *Id.* Dkt. 84-1 at 1-2.

**III. OCC Intervenes on Behalf of the Banks in IFPA Litigation by Promulgating the Interim Rule and Interim Order**

65. OCC has a history of favoring financial interests by purporting to preempt state attempts to protect their constituents. For example, in the 1980s, courts rejected OCC's attempt to preempt state laws affecting deposit-taking activities as "palpably erroneous." *Perdue v. Crocker Nat'l Bank*, 702 P.2d 503, 521 (Cal. 1985), *appeal dismissed*, 475 U.S. 1001 (1986). Congress agreed, referring to OCC's position as "inappropriately aggressive, resulting in preemption of State law in situations where the federal interest did not warrant that result." H.R. Conf. Rep. No. 103-651, at 53 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2068, 2074.

66. More recently, in *Cuomo v. Clearing House Ass'n, L.L.C.*, the Supreme Court rejected OCC's attempt by regulation to preempt state investigations into lending practices, ruling that the OCC action exceeded the agency's authority and unreasonably interpreted the statute. 557 U.S. 519 (2009).

67. Other courts have observed that "questions have repeatedly been raised about OCC's independence from the banks it oversees." *Wultz v. Bank of China Ltd.*, 61 F. Supp. 3d 272, 292 & n.102 (S.D.N.Y. 2013) (collecting authorities).

68. True to form, OCC sought to influence the Illinois litigation in favor of the Banks and card networks, first by filing amicus briefs supporting the Banks in both the district court and the court of appeals, and then by issuing the Interim Rule and Interim Order.

69. OCC's Interim Rule addressed the agency's position on the power of national banks to charge non-interest fees by amending 12 C.F.R. § 7.4002—the regulation the Banks unsuccessfully attempted to rely upon in their preemption arguments in *Raoul*. Before the Interim Rule, OCC's regulation explained that the National Bank Act protected a national bank's power to charge "its customers" non-interest charges and fees. The Interim Rule seeks to remove that limitation, instead amending 12 C.F.R. § 7.4002 purportedly to grant national banks the authority to assess and collect fees, including "interchange fees," through "intermediaries, partners, payment networks, interchanges or other third parties," regardless whether the fees come from a "customer" of the bank. 91 Fed. Reg. 22,991.

70. OCC made no effort to comply with the APA's notice-and-comment provisions, relying entirely on the spurious and unsupported notion that notice and comment would be "impracticable" for this Interim Rule. 91 Fed. Reg. 22,992.

71. OCC's Interim Order relied on the Interim Rule to conclude that the National Bank Act preempted the IFPA.

72. Like the Interim Rule, the Interim Order also made no effort to comply with the APA's or the National Bank Act's procedural requirements.

73. After the OCC's Rule and Order were issued, the U.S. Court of Appeals for the Seventh Circuit vacated the district court's summary judgment order and remanded the case in May 2026 for further consideration. No. 26-1354, Dkt. 104.

74. The district court then reconsidered its decision upholding the IFPA in light of the OCC's actions. The court did "not find the underlying justifications present in the Interim Final Order to be particularly persuasive," and observed that the "Interim Final Order itself sits in tension with the agency's statutory authority." *Raoul* Perm. Inj. Order at 16. The court also observed that OCC's requirement to rely on "substantial evidence based on the record . . . does not appear to have been met here," and that "OCC's conclusory regurgitation" of "Plaintiffs' last-minute lobs attempting to construe the IFPA as something other than a state consumer financial law do not persuade the Court to the contrary." *Id.* at 16. But the court was "not in a posture to invalidate the Interim Final Order under the APA" because no APA claim had been brought in that case. *Id.* at 17.

75. Believing a court cannot review challenges to the Interim Rule and Interim Order unless a new lawsuit was filed under the APA, the court held that, "[g]iven the OCC's reconceptualized articulation of the breadth of the limits of national banks' legitimate powers," the "new rule changes [the IFPA's] role in the analysis." *Id.* at 24. Thus "in light of the new regulation, the IFPA does 'impose an undue burden on the performance of the banks' functions,' and thus is invalid with regard to national banks." *Id.* (internal citation omitted). The court thus entered a permanent injunction against enforcement of the IFPA.

76. The U.S. District Court for the Northern District of Illinois, in the same *Raoul* litigation, later held that it also could not rule on challenges to the National Credit Union Administration's similar action purporting to preempt the IFPA as applied to federal credit unions. *See*

Preemption—Federal Credit Union Non-Interest Charges and Fees, 91 Fed. Reg. 34,725 (June 9, 2026). The court again ruled that it "cannot grant an APA claim that does not exist, nor any other claim unpleaded," *Raoul*, No. 24-cv-7307 (N.D. Ill.) Dkt. 240 at 7-8 (citation and quotation marks omitted).[4]

77. The U.S. District Court for the Northern District of Illinois entered its combined permanent injunction on September 28, 2026, alongside a stipulation of final judgment subject to reservation of the right to appeal. Dkts. 242, 243. The Illinois Attorney General appealed the court's combined permanent injunction on October 9, 2026, seeking to reverse the grant of injunctive relief. *Id.* Dkt. 244.

78. No APA claim exists in that case because of the case's posture: the Banks' challenge to the IFPA as preempted by federal law.

79. Accordingly, Plaintiffs bring this APA challenge to OCC's Interim Rule and Interim Order.

**FIRST CAUSE OF ACTION**

**Violation of the APA: Interim Rule is Contrary to Law and Exceeds Statutory Authority**

80. The allegations in paragraphs 1–79 are expressly incorporated herein as if restated in full.

81. OCC must act only within its statutory authority and in accordance with federal law, because "an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *see also Cuomo v. Clearing House Ass'n, L.L.C.*, 557

---

[4] Plaintiffs in this action plan also to challenge the National Credit Union Administration's actions as violating the APA and exceeding the agency's statutory authority.

U.S. 519, 525 (2009) (refusing to hold certain state actions preempted by OCC regulation because the regulation exceeded OCC's authority and unreasonably interpreted the statute under *Chevron*).

82. The Interim Rule is based on a flawed legal interpretation of OCC powers, of national bank powers, and of preemption under the National Bank Act, making it "in excess of statutory . . . authority" and "short of statutory right." 5 U.S.C. § 706(2)(C).

83. Congress empowers OCC to "prescribe rules and regulations to carry out the responsibilities of the office." 12 U.S.C. § 93a. The National Bank Act grants national banks certain enumerated powers, such as "receiving deposits" and "loaning money," as well as "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24.

84. The Interim Rule misinterprets the National Bank Act by deciding that the Act protects a national bank's collection of fees that are imposed on entities that are not bank customers and that are set by non-bank third-party card networks. Setting interchange fees, as clearly defined in the IFPA, is the business of card networks, and the excessive amount of interchange fees set by these card networks is not necessary to compensate banks for their loan or deposit-taking activities. Indeed, banks are compensated for these activities by the charges and fees imposed on their *customers*—the people taking loans from or providing deposits to the banks. Interchange fees on merchants, who receive no banking services from card-issuing banks in exchange for those fees, are merely another revenue source for banks. But the National Bank Act does not shield all national banks' money-making activities from state regulation. Supracompetitive interchange fees are not "necessary to carry on the business of banking." 12 U.S.C. § 24.

85. Stretching to reach its conclusion, OCC's Interim Rule mistakenly assumes that banks have no alternative compensation for their credit and debit activities beyond network-set

interchange fees because bilateral fee negotiation between banks and merchants is supposedly unworkable. 91 Fed. Reg. 22,991. OCC cites nothing for this proposition, and it defies economics and experience. *See, e.g.*, Nicholas Economides, *Competition Policy Issues in the Consumer Payments Industry*, *in Moving Money: The Future of Consumer Payment* 122 (Robert E. Litan & Martin Neil Baily eds., 2009), https://perma.cc/6B6E-22PQ. Indeed, the very banks on whom OCC relies claim that "[n]ational-bank Issuers also can, and sometimes do, negotiate different interchange rates with particular merchants or Acquirers." *Raoul*, No. 26-1354 (Seventh Circuit), App. Br. Dkt. 12 at 49. Contrary to OCC's core assumption, banks could set their own fees. OCC's resultant preemption conclusion is incorrect.

86. OCC also fails to account for the fact that interchange fees in the United States currently are set at a supracompetitive rate, and that nothing in the National Bank Act authorizes the receipt of fees set by third parties far beyond what is necessary to compensate banks for their lending and deposit activities. The receipt of such excessive fees is a windfall rather than a Congressionally protected banking power. Indeed, the Interim Rule itself inadvertently highlights that distinction by explaining that it protects "[b]usiness decisions" that "should be arrived at by each national bank *on a competitive basis and not on the basis of any agreement*, arrangement, undertaking, understanding, or discussion with other banks or their officers." 91 Fed. Reg. 22,995 (emphasis added). Interchange fees in the United States are not independently established by national banks through competitive decision-making; they are centrally established by card networks and accepted by issuing banks. The Interim Rule's specific authorization of those network-set interchange fees is therefore arbitrary and capricious. ¶ 50, *supra*. OCC also failed to consider whether the current amount of interchange fees is necessary to compensate banks, and ignored that banks collect hundreds of billions in other fees and interest directly from card customers to compensate

them for credit and debit card activities. Consumer Fin. Prot. Bureau, *The Consumer Credit Card Market: Report to Congress* 5 (Dec. 2025), https://tinyurl.com/57pjxt9e (citing $160 billion in consumer-interest charges and $31.3 billion in other consumer card fees for credit cards).

87. Nothing in the Interim Rule or Interim Order demonstrates that lower interchange fees—which will reduce merchant expenses and lower customer prices—will meaningfully deter consumers from using credit and debit cards. At most, OCC speculates that if bank revenues decrease, they may cut back on rewards programs. 91 Fed. Reg. 23,153. But banks could just as well cut back on their own immense net profit margins, which are among the highest of any industry in the United States. Aswath Damodaran, *Margins by Sector (US)*, NYU Stern Sch. Of Bus. (Jan. 2026), https://tinyurl.com/5658jwrs. Moreover, consumers around the world make widespread use of debit and credit cards despite interchange fees far lower than those that prevail in the United States. Banks can also avoid the IFPA by negotiating fees with merchants directly instead of using fees set by third party card networks. And nothing in the IFPA prohibits banks from contracting with card networks if that is what they deem most "efficient." Rather, in the process of regulating the fee-setting business of card networks, the IFPA reduces the interchange fee amount a bank receives if the bank allows the card networks to set the fees (as opposed to competitively setting the fees itself) by prohibiting fees on the tax and tip portions of a transaction.

88. The Interim Rule also removes, without any analysis or justification, the requirement that bank fees be charged to "customers," 91 Fed. Reg. 22,991, even though nothing in the National Bank Act empowers banks to impose fees on merchants to whom the banks are *not* providing banking services. This decision alone exceeds OCC's authority under the National Bank Act. Interchange fees are not charged to customers, unlike even non-depositor check cashing and

ATM fees, where the non-depositor is still a "customer" receiving banking services. *See Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1197-98 (11th Cir. 2011). OCC offers no response.

89. The Interim Rule is thus contrary to law and exceeds statutory authority.

90. OCC's actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at law.

**SECOND CAUSE OF ACTION**

**Violation of the APA: Interim Order is Contrary to Law and Exceeds Statutory Authority**

91. The allegations in paragraphs 1–79 are expressly incorporated herein as if restated in full.

92. OCC must act only within its statutory authority and in accordance with federal law, because "an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n*, 476 U.S. at 374; *see also Cuomo*, 557 U.S. at 525 (refusing to hold certain state actions preempted by OCC regulation because the regulation exceeded OCC's authority and unreasonably interpreted the statute under *Chevron*).

93. The Interim Order is based on a flawed legal interpretation of preemption under the National Bank Act, making it "in excess of statutory . . . authority" and "short of statutory right." 5 U.S.C. § 706(2)(C).

94. The Interim Order is based on the Interim Rule, which is substantively and legally invalid. An agency's "order may not stand if the agency has misconceived the law," *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 94 (1943), and when an agency's order "relie[s] upon an improperly promulgated regulation" that was procedurally invalid, the agency's order also "cannot stand." *MST Exp. v. Dep't of Transp.*, 108 F.3d 401, 402 (D.C. Cir. 1997).

95. Like the Interim Rule, the Interim Order misinterprets the National Bank Act by deciding that the Act protects a national bank's collection of fees that are imposed on entities that are not bank customers and that are set by third-party card networks.

96. The National Bank Act preempts "State consumer financial laws . . . only if": (1) the law's application would have a "discriminatory effect on national banks, in comparison with the effect of the law on a bank chartered by that State"; or (2) the state law "prevents or significantly interferes" with the national bank's exercise of "*its* powers." 12 U.S.C. § 25b(b)(1)(A)-(B) (emphasis added).

97. The IFPA is a state consumer financial law, because it "directly and specifically regulates the manner, content, or terms and conditions of any financial transaction . . . with respect to a consumer." 12 U.S.C. § 25b(a)-(b). Credit and debit card transactions are unquestionably financial transactions "with respect to" a consumer, and the IFPA directly regulates the terms and conditions associated with those financial transactions.

98. The IFPA has no discriminatory effect on national banks, and neither the banks nor OCC argued that it did in the district court litigation over the IFPA. Thus the question is whether, under the *Barnett Bank* standard, the IFPA "prevents or significantly interferes" with the national bank's exercise of "*its* powers." 12 U.S.C. § 25b(b)(1)(B) (emphasis added). It does not: fees set by third parties do not fall within a bank's exercise of "its" powers, *id.*, nor do they qualify as "necessary to carry on the business of banking," 12 U.S.C. § 24.

99. The IFPA regulates the business of card networks, not the business of banking. The IFPA *only* regulates interchange fees that *card networks* set; when banks set interchange fees then, the IFPA does not apply. 815 ILCS § 151/150-5. A law that sets requirements for fees that card networks establish and collect regulates the business of card networks, and not the business of

banking. It certainly does not regulate any bank powers that are "necessary to carry on the business of banking." 12 U.S.C. § 24.

100. Nor does a downstream effect on bank revenue allow the National Bank Act to preempt the IFPA. Courts have explained that the *Barnett Bank* standard permits state regulations on national banks when the regulation would result in decreased bank revenue. For example, the National Bank Act did not preempt a State law requiring banks to pay interest on mortgage-escrow accounts, because nothing in the National Bank Act "expressly prohibits state interest-on-escrow laws," and the banks "failed to demonstrate" that the requirement conflicted with "express banking power to make real estate loans" and their "incidental power to establish mortgage-escrow accounts," even if it impacted the banks' bottom line. *Conti*, 157 F.4th at 20. Nor did the National Bank Act preempt a state law requiring banks to pay interest on escrow accounts, because although the law "raises the cost to national banks to use escrow accounts and may discourage them from issuing and servicing loans," that fact did not "compel" preemption. *Kivett*, 154 F.4th at 642, 648.

101. OCC mistakenly believes that the National Bank Act preempts state law whenever that law impacts a bank's ability to operate "efficiently." 91 Fed. Reg. 23,153. That is not the law. *See*, *e.g.*, *Conti*, 157 F.4th at 25 ("We reject" the argument that "preemption applies whenever a state law dictates the terms of a banking product in a manner that impairs a bank's 'flexibility' or 'efficiency.'"). And if it were, nothing in the IFPA prohibits banks from contracting with card networks. Instead, when regulating the business of card networks, the IFPA may result in a downstream interchange fee reduction for a bank only if the bank has allowed the card networks to set the fees. The bank retains the power to set its own fees, in which case the IFPA would not affect the bank's interchange revenue.

102. The Durbin Amendment, which imposes a federal cap on debit card interchange fees but does not foreclose more stringent state regulation, confirms that Congress did not seek to preempt laws like the IFPA. The IFPA falls squarely within the 15 U.S.C. § 1693q safe harbor that applies to the Durbin Amendment. The IFPA provides consumers with additional protections from inflated interchange fees on top of those "afforded by" the Durbin Amendment. *Id.* Because the IFPA provides consumers greater protection than does federal law, the safe harbor shields it. *Id.* The National Bank Act preemption rule enacted in Dodd-Frank should be read in light of that statutory context. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (courts "interpret the statute as a symmetrical and coherent regulatory scheme" (citation omitted)). It would be incongruous to read Dodd-Frank's preemption standard to preempt the IFPA.

103. The Interim Order rests on additional concerns that Congress and the Supreme Court have rejected as bases for National Bank Act preemption. OCC relies on the preemption reasoning that States might pass other laws—whether "substantially similar" laws or even "others [that] could differ vastly"—resulting in a "patchwork of State laws" that undermine uniformity. 91 Fed. Reg. 23,154. It is difficult to conceive of any State law that would survive OCC's broad and speculative approach, under which any apparent State deviation from uniformity would result in preemption. The Supreme Court already has rejected any such "categorical test that would preempt virtually all state laws that regulate national banks, at least other than generally applicable state laws such as contract or property laws." *Cantero v. Bank of America, N.A.*, 602 U.S. 205, 220-21 (2024). And Congress specified that the National Bank Act "does not occupy the field in any area of State law," 12 U.S.C. § 25b(b)(4), requiring instead a "nuanced" analysis whereby only some state laws are preempted. *Cantero*, 602 U.S. at 219-20. OCC's Interim Order is incompatible with that requirement.

104. The Interim Order also fails to address the fact that United States interchange fees are currently set at a supracompetitive rate, and that nothing in the National Bank Act authorizes the receipt of anticompetitive fees on noncustomers set by third-party agreements. The receipt of such fees is not a question of efficiency, *cf.* 91 Fed. Reg. 23,153—it is a windfall. The Interim Rule itself, on which the Interim Order relies, amends § 7.4002 while retaining the requirement that decisions regarding charges and fees "should be arrived at by each national bank *on a competitive basis and not on the basis of any agreement*, arrangement, undertaking, understanding, or discussion with other banks or their officers." 91 Fed. Reg. 22,995 (emphasis added) (applying that requirement to "business decisions" regarding charges and fees). Interchange fees in the United States are not independently established by national banks through competitive decision-making, however, they are centrally established by card networks and accepted by issuing banks. ¶¶ 54-59, *supra*. Therefore, the Interim Rule does not provide a basis for OCC's Interim Order preemption determination. The Interim Order rests on nothing.

105. OCC also failed to consider whether the current rates of interchange fees are necessary to compensate banks, and ignored that banks collect hundreds of billions in other fees and interest directly from card customers. That also makes OCC's conclusion that the Interim Rule preempts the IFPA legally wrong.

106. Similarly, OCC's actions neither change nor sufficiently address the fact that the IFPA regulates only the interchange rates that the card networks, not the banks, set. 815 Ill. Comp. Stat. § 151/150-5. National banks are free to set their own fees for Illinois transactions and avoid application of the IFPA entirely; only those that use fees established by the card networks are subject to the IFPA. The Interim Order neither purports to empower the card networks to establish interchange fees nor preempts the IFPA's regulation of card networks' acts in doing so. 91 Fed.

Reg. 23,151 (arguing the IFPA is preempted "[a]s applied to national banks and Federal savings associations").

107. The Interim Order is contrary to law and exceeds statutory authority.

108. OCC's actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Violation of the APA: Interim Rule Is Arbitrary or Capricious

109. The allegations in paragraphs 1–79 are expressly incorporated herein as if restated in full.

110. The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

111. To that end, the APA requires that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

112. Thus, an agency action is arbitrary and capricious under the APA where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

113. The Interim Rule is arbitrary and capricious.

114. OCC's determinations in the Interim Rule do not rely on any robust rulemaking record because OCC unjustifiably skipped the administrative process. Instead, OCC relies on the

banks' arguments in the *Raoul* litigation (which do not support preemption) and second-hand speculation.

115. Worse, OCC wholly ignores contrary evidence and arguments presented in the *Raoul* litigation before issuing its Interim Rule. For example, OCC does not address contentions by the Illinois Attorney General, Plaintiffs as *Amici*, and others that (1) the IFPA will not significantly interfere with national bank powers because compliance is feasible as a routine update to network technical standards; (2) the bulk of the compliance burden falls on merchants, processors, and card networks, not on banks; (3) card networks already calculate variable interchange rates across hundreds of jurisdictions globally; (4) interchange fees vastly exceed processing costs so banks can still profit handsomely from interchange fees under the IFPA; (5) banks operate profitably under far more restrictive interchange regimes globally; (6) market-exit predictions came from state-chartered institutions, not national banks; and (7) the banks remain free under the IFPA to set their own fees and still apply them to taxes and tips. *See Raoul*, No. 26-1354 (Seventh Circuit) Dkt. 61 at 4-7; Dkt. 68 at 4, 14-22; Dkt. 71 at 29-30; No. 1:24-cv-07307 (N.D. Ill.) Dkt. 135-1 at 2, 8-11; *see also State Farm*, 463 U.S. at 43. OCC did not consider these arguments when issuing its Interim Rule, and thus the Interim Rule is arbitrary and capricious.

116. OCC also fails to address the Attorney General's and *Amici*'s contentions, and the federal district court's conclusions, about the scope of national bank powers based on how (1) interchange fees are centrally set by card networks not competitively set by banks; (2) the Durbin Amendment regulates debit interchange in a manner that preserves a safe harbor for more stringent state regulation; (3) under the Banks' theory of preemption, "national banks could shield a vast amount of their otherwise regulatable activities from State regulation by hiding behind third-party

entities"; (4) the IFPA is a consumer financial law; or (5) Dodd-Frank's legislative history confirms Congress's narrow preemption standard. *See Raoul*, No. 26-1354 (Seventh Circuit) Dkt. 57 at 11, 17; Dkt. 68 at 4-5, 16-17, 23-27; Dkt. 71 at 20-23; No. 1:24-cv-07307 (N.D. Ill.) Dkt. 139-1 at 5, 13-14; Dkt. 179 at 21-22; *see also State Farm*, 463 U.S. at 43. OCC did not consider these arguments when issuing its Interim Rule, and thus the Interim Rule is arbitrary and capricious.

117. OCC's Interim Rule relies on the premise that banks have no practical alternative compensation for their credit and debit activities because bilateral fee negotiation between banks and merchants would supposedly be unworkable. 91 Fed. Reg. 22,991. OCC cites nothing for this proposition, and it defies economics and experience. *See*, *e.g.*, Economides, *Competition Policy Issues in the Consumer Payments Industry*, ¶ 85, *supra*. The very banks upon whom OCC relies claim that "[n]ational-bank Issuers also can, and sometimes do, negotiate different interchange rates with particular merchants or Acquirers." *Raoul*, No. 26-1354 (Seventh Circuit), App. Br. Dkt. 12 at 49. Contrary to OCC's core assumption, banks could set their own fees. *See State Farm*, 463 U.S. at 43.

118. OCC's unwillingness to consider arguments that might limit banks' profits is unsurprising given that "questions have repeatedly been raised about OCC's independence from the banks it oversees." *Wultz*, 61 F. Supp. 3d at 292 & n.102 (collecting authorities). But it is a basic tenet of administrative law that agency decisionmaking that declines to consider opposing considerations is arbitrary and capricious. *State Farm*, 463 U.S. at 43.

119. OCC did not consider any of the arguments above, despite relying on other litigants' filings in the same litigation, when it issued its Interim Rule. Thus the Interim Rule is arbitrary and capricious.

120. OCC's actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### Violation of the APA: Interim Order Is Arbitrary or Capricious

121. The allegations in paragraphs 1–79 are expressly incorporated herein as if restated in full.

122. The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

123. To that end, the APA requires that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43.

124. Thus, an agency action is arbitrary and capricious under the APA where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

125. The Interim Order is arbitrary and capricious.

126. OCC's determinations in the Interim Order do not rely on any robust record, because OCC unjustifiably skipped the administrative process. Instead, OCC relies on the Banks' arguments in the *Raoul* litigation—which do not support preemption—and upon second-hand speculation.

127. In addition to relying on the Banks' arguments rather than on any robust record, OCC fails entirely to consider the contentions advanced by the Illinois Attorney General or by any

of his supporting *Amici*, relying only on the arguments of the banks in the litigation without relying on or contending with the arguments of the other litigants.

128. For example, OCC does not address contentions by the Illinois Attorney General, Plaintiffs as *Amici*, and others that (1) the IFPA will not significantly interfere with national bank powers because compliance is feasible as a routine update to network technical standards; (2) the bulk of the compliance burden falls on merchants, processors, and card networks, not on banks; (3) card networks already calculate variable interchange rates across hundreds of jurisdictions globally; (4) interchange fees vastly exceed processing costs so banks can still profit handsomely from interchange fees under the IFPA; (5) banks operate profitably under far more restrictive interchange regimes globally; (6) market-exit predictions came from state-chartered institutions, not national banks; and (7) the banks remain free under the IFPA to set their own fees and still apply them to taxes and tips. *See* ¶ 115, *supra*; *see also State Farm*, 463 U.S. at 43. OCC did not consider these arguments when issuing its Interim Order, and thus the Interim Order is arbitrary and capricious.

129. OCC also fails to address the Attorney General's and *Amici*'s contentions, and the *Raoul* district court's conclusions, about the scope of national bank powers based on how (1) interchange fees are centrally set by card networks not competitively set by banks; (2) the Durbin Amendment regulates debit interchange in a manner that preserves a safe harbor for more stringent state regulation; (3) under the Banks' theory of preemption, "national banks could shield a vast amount of their otherwise regulatable activities from State regulation by hiding behind third-party entities"; (4) the IFPA is a consumer financial law; or (5) Dodd-Frank's legislative history confirms Congress's narrow preemption standard. *See* ¶ 116, *supra*; *see also State Farm*, 463 U.S. at

43. OCC did not consider these arguments when issuing its Interim Order, and thus the Interim Order is arbitrary and capricious.

130. This failure to consider contrary arguments led OCC to make flawed factual conclusions. For example, OCC claims in its Interim Order that "[c]ompliance with the interchange fee prohibition . . . is likely to introduce significant complexity into the payment card systems, including by requiring national banks to accommodate the taxation schemes of hundreds of localities." 91 Fed. Reg. 23,153. But it is the merchants—many of whom operate in multiple localities and states—that must navigate variances in local sales taxation, not the banks. The IFPA requires merchants to comply with sundry local tax laws, determine the correct tax amount, and transmit a single number (the tax amount) at point of sale. 815 ILCS § 151/150-10(a) (requiring "[t]he merchant [to] transmit the tax or gratuity amount data as part of the authorization or settlement process").

131. OCC's Interim Order relies on the premise that banks have no practical alternative compensation for their credit and debit activities because bilateral fee negotiation between banks and merchants would supposedly be "complex, inefficient, ineffective, and costly." 91 Fed. Reg. 23,153. But the unavailability and impracticality of this option defies economics and experience. *See, e.g.*, Economides, *Competition Policy Issues in the Consumer Payments Industry*, ¶ 85, *supra*. The very banks upon whom OCC relied claimed that "[n]ational-bank Issuers also can, and sometimes do, negotiate different interchange rates with particular merchants or Acquirers." *Raoul*, No. 26-1354 (Seventh Circuit), App. Br. Dkt. 12 at 49. Contrary to OCC's core assumption, banks could set their own fees. *See State Farm*, 463 U.S. at 43.

132. It is a basic tenet of administrative law that agency decisionmaking that declines to consider opposing considerations is arbitrary and capricious. *State Farm*, 463 U.S. at 43.

133. The Interim Order also violates the Interim Rule's requirement that fees be "arrived at by each national bank *on a competitive basis and not on the basis of any agreement*[.]" 91 Fed. Reg. 22,995 (emphasis added). But the interchange fees that the IFPA affects are not independently established by national banks through competitive decision-making; they are centrally established by card networks and accepted by issuing banks. It is "axiomatic that an agency is bound by its own regulations," and that "an agency action may be set aside as arbitrary and capricious if the agency fails to comply with its own regulations." *Alon Ref. Krotz Springs, Inc. v. Env't Prot. Agency*, 172 F.4th 12, 17 (D.C. Cir. 2026) (cleaned up). OCC's action here should be set aside as arbitrary and capricious because it failed to adhere to its own rule requirements that national banks' fees must be arrived at on a competitive basis.

134. OCC did not consider any of the arguments above, despite relying on other litigants' filings in the same litigation, when it issued its Interim Order. Thus the Interim Order is arbitrary and capricious.

135. OCC's actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Violation of the APA: Procedurally Invalid Interim Rule

136. The allegations in paragraphs 1–79 are expressly incorporated herein as if restated in full.

137. The APA requires that "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments" before a rule goes into effect. 5 U.S.C. § 553(c).

138. The Interim Rule constitutes a "rule" within the meaning of the APA, 5 U.S.C. § 551(4) because it purports to provide a "statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy."

139. OCC did not provide prior notice before issuing the Interim Rule and did not conduct notice and comment procedures before the Interim Rule went into effect.

140. An agency may only dispense with the APA's notice and comment requirements if it finds, "for good cause," that "notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B).

141. In the Interim Rule, OCC states that "prior notice and public comment are impracticable for this interim final rule due to the regulatory confusion created by the February 2026, *Raoul SJ* opinion, which found that Federal law does not preempt a key provision of the Illinois Interchange Fee Prohibition Act (IFPA), and the potential consequences of such confusion." 91 Fed. Reg. 22,992.

142. OCC's determination that prior notice and public comment were impracticable for the Interim Rule is erroneous. The impracticability exception is "to be narrowly construed and only reluctantly countenanced." *Mack Trucks, Inc.*, 682 F.3d at 93. This exception applies only where, for example, delay would "imminently threaten life or physical property." *Sorenson Commc'ns Inc.*, 755 F.3d at 706. "[R]egulatory confusion" does not suffice. *See* 91 Fed. Reg. 22,992. That a state law might reduce the amount of interchange fees banks and credit unions may receive, or that those institutions might incur costs in complying with that state law, does not meet this high bar.

143. Even if there had been an emergency, an "emergency of the agency's own making" cannot "constitute good cause" for avoiding notice-and-comment rulemaking. *Nat. Res. Def.*

*Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 115 (2d Cir. 2018) (cleaned up). OCC's alleged concerns arose from the Act's July 1, 2026, effective date, see 91 Fed. Reg. 22,992, but "statutory deadlines in and of themselves do not generally provide a basis for invoking . . . impracticability," *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1381 (Fed. Cir. 2017). Indeed, a "contrary rule would encourage administrative gamesmanship because an agency . . . could simply wait until the eve of a statutory . . . deadline, then raise up the good cause banner and promulgate rules without following APA procedures." *Id.* (cleaned up). That is exactly what occurred here. In the Interim Rule, OCC acknowledges that the IFPA was enacted on June 7, 2024, *see* 91 Fed. Reg. 22,992, and a year later, its effective date was delayed to July 1, 2026. OCC was fully cognizant of these facts and, indeed, was *filing* amicus *briefs in the case* rather than amending its own regulations. Thus, OCC had nearly two years to promulgate a full notice-and-comment rule to address any "confusion" created by the Act, 91 Fed. Reg. 22,992, but it chose instead to promulgate the Interim Rule without notice and comment years into the litigation, on the eve of oral argument at the Seventh Circuit.

144. OCC has therefore acted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

145. OCC's Interim Rule harms Plaintiffs, and Plaintiffs have no adequate remedy at law. In addition to purporting to be the basis of preempting a state law that would save Plaintiffs and their members millions in interchange fees, OCC's actions deprived Plaintiffs of the opportunity to offer comments and input before the Interim Rule went into effect, thus depriving them of a meaningful chance to change the content of the Interim Rule before it went into effect.

## SIXTH CAUSE OF ACTION

### Violation of the APA: Procedurally Invalid Interim Order

146. The allegations in paragraphs 1–79 are expressly incorporated herein as if restated in full.

147. The APA requires that "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments" before a rule goes into effect. 5 U.S.C. § 553(c).

148. The Interim Order constitutes a "rule" within the meaning of the APA, 5 U.S.C. § 551(4) because it purports to provide a "statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy."

149. The Interim Order has general applicability and is intended to have a future effect; OCC cannot transform a rule into an order exempt from notice and comment requirements merely by labeling it an order. *See, e.g.*, *Safari Club Int'l v. Zinke*, 878 F.3d 316, 332 (D.C. Cir. 2017).

150. OCC did not provide prior notice before issuing the Interim Order and did not conduct notice-and-comment procedures before the Interim Order went into effect.

151. An agency may only dispense with the APA's notice and comment requirements if it finds, "for good cause," that "notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B).

152. In the Interim Order, OCC stated that "notice-and-comment is impracticable" for the same reasons explained in the Interim Rule. 91 Fed. Reg. 23,155.

153. OCC's determination that prior notice and public comment were impracticable for the Interim Order is erroneous. The impracticability exception is "to be narrowly construed and only reluctantly countenanced." *Mack Trucks, Inc.*, 682 F.3d at 93. This exception applies only where, for example, delay would "imminently threaten life or physical property." *Sorenson*

*Commc'ns Inc.*, 755 F.3d at 706. "[R]egulatory confusion" does not suffice. *See* 91 Fed. Reg. 22,992.

154. Even if there had been an emergency, an "emergency of the agency's own making" cannot "constitute good cause" for avoiding notice-and-comment rulemaking. *Nat. Res. Def. Council*, 894 F.3d at 115 (cleaned up). OCC's alleged concerns arose from the Act's July 1, 2026 effective date, see 91 Fed. Reg. 23,155, but "statutory deadlines in and of themselves do not generally provide a basis for invoking . . . impracticability," *Mid Continent Nail Corp.*, 846 F.3d at 1381. Indeed, a "contrary rule would encourage administrative gamesmanship because an agency . . . could simply wait until the eve of a statutory . . . deadline, then raise up the good cause banner and promulgate rules without following APA procedures." *Id.* (cleaned up). That is exactly what occurred here. In the Interim Rule, OCC acknowledges that the Act was enacted on June 7, 2024, see 91 Fed. Reg. 22,992, and a year later, its effective date was delayed to July 1, 2026. Thus, OCC had nearly two years to promulgate a rule to address any "confusion" created by the Act, 91 Fed. Reg. 23,155, but it elected to participate in the *Raoul* litigation as an *amicus curiae* instead.

155. OCC has therefore acted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

156. OCC's actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at law. In addition to purporting to be the basis of preempting a state law that would save Plaintiffs and their members millions in interchange fees, OCC's actions deprived Plaintiffs of the opportunity to offer comments and input before the Interim Order went into effect, thus depriving them of a meaningful chance to change the content of the Interim Order before it went into effect.

## SEVENTH CAUSE OF ACTION

### Violation of the National Bank Act: Procedurally Invalid Interim Order

157. The allegations in paragraphs 1–79 are expressly incorporated herein as if restated in full.

158. OCC must abide by certain procedures when it issues an order that purports to preempt state laws. *See* 12 U.S.C. § 25b(b)(1)(B); 12 U.S.C. § 43(a).

159. Section 25b applies when OCC seeks to preempt a State consumer financial law, which is defined as "a State law that . . . directly and specifically regulates the manner, content, or terms and conditions of any financial transaction . . . or any account related thereto, with respect to a consumer." 12 U.S.C. § 25b(a)(2).

160. The Interim Order seeks to preempt the IFPA, which is a state law that regulates the manner, content, or terms and conditions of a financial transaction with respect to a consumer. Credit and debit card transactions are unquestionably financial transactions "with respect to" a consumer, and the IFPA directly and specifically regulates the manner, terms, and conditions of those financial transactions by prohibiting banks from charging network-established interchange fees for the tax and tip portions of the transaction as a condition of acceptance. Indeed, interchange fees are typically passed on to consumers in the form of higher prices.

161. OCC erroneously and arbitrarily determined that the IFPA is not a State consumer financial law when it stated that "the relevant interchange fee transaction is between a merchant and the other participants in the card network." 91 Fed. Reg. 23,155. Moreover, OCC's effort to avoid section 25b's procedural requirements is irreconcilable with its repeated invocation of section 25b in both the Interim Order and its amicus briefs in the *Raoul* litigation. Indeed, OCC cites section 25b as a source of its authority to issue the Interim Order. *See* 91 Fed. Reg. 23,151, n.11. The Interim Order also conducts its preemption analysis under the *Barnett Bank* standard, which is the precise analysis required under section 25b(b)(1).

162. Accordingly, OCC was not permitted to issue the Interim Order without "substantial evidence, made on the record of the proceeding," that "supports the specific finding regarding the preemption of such provision," and OCC must make the determination on a "case-by-case basis." 12 U.S.C. § 25b(b)-(c). OCC did none of this, so its Interim Order is invalid.

163. The Interim Order was issued by a signatory describing herself as the First Deputy Comptroller of the Currency, 91 Fed. Reg. 23,158, who upon information and belief may have been the Acting Chief of Staff of the Comptroller of the Currency, despite a statutory requirement that preemption determinations must "be made by the Comptroller, and *shall not be delegable to another officer or employee of the Comptroller* of the Currency," 12 U.S.C. § 25b(b)(6) (emphasis added). The Interim Order is invalid for that reason as well.

164. In the alternative, Section 43(a) applies when the OCC issues "any opinion letter or interpretive rule . . . that concludes that Federal law preempts the application to a national bank of any State law regarding community reinvestment, consumer protection, fair lending, or the establishment of intrastate branches." Section 43(a) forbids OCC from issuing such a preemption decision without prior notice and comment. An exception to this requirement applies where the OCC "determines in writing that the exception is necessary to avoid a serious and imminent threat to the safety and soundness of any national bank." 12 U.S.C. § 43(c)(3)(A).

165. In the Interim Order, OCC states that there were "strong arguments that section 43 does not apply to this order," without identifying those arguments. 91 Fed. Reg. 23,155. OCC concludes that an exception to the notice-and-comment requirement applies because "the IFPA creates a complex and potentially unworkable standard, and it imposes significant potential liability for non-compliance." *Id.*

166. OCC errs in applying this exception. Specifically, OCC does not explain how "potential liability" arising from a "complex and potentially unworkable standard," *id.*, amounts to a "serious and imminent threat to the safety and soundness" of national banks—nor does the IFPA impose such a threat.

167. OCC's actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at law. In addition to purporting to be the basis of preempting a state law that would save Plaintiffs and their members millions in interchange fees, OCC's actions deprived Plaintiffs of the opportunity to offer comments and input before the Interim Order went into effect, thus depriving them of a meaningful chance to change the content of the Interim Order before it went into effect.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court grant relief and judgment as follows:

(A) Declare that the Interim Rule is unlawful in violation of the APA.

(B) Declare that the Interim Rule is unlawful in violation of the National Bank Act.

(C) Vacate and set aside the Interim Rule.

(D) Enjoin Defendants from enforcing the Interim Rule.

(E) Declare that the Interim Order is unlawful in violation of the APA.

(F) Declare that the Interim Order is unlawful in violation of the National Bank Act.

(G) Vacate and set aside the Interim Order.

(H) Enjoin Defendants from enforcing the Interim Order.

(I) Award reasonable attorneys' fees and allowable costs, including under the Equal Access to Justice Act, 5 U.S.C. § 504, and 28 U.S.C. § 2412.

(J) Grant Plaintiffs such other and further relief to which they are justly entitled at law and in equity.

Dated: November 12, 2026

Respectfully submitted,

*/s/ Mithun Mansinghani*

**Mithun Mansinghani**
OK Bar No. 32453 (active)
DC Bar No. 1010818 (inactive)
**Will Milam**
*Pro Hac Vice motion forthcoming*
LEHOTSKY COHN LLP
629 W. Main Street
Oklahoma City, OK 73102
(512) 693-8350
mithun@lehotskycohn.com
wmilam@lehotskycohn.com

**Michael B. Schon**
DC Bar No. 989893 (active)
**Rick W. Eberstadt**
DC Bar No. 1601996 (active)
*Pro Hac Vice motion forthcoming*
**Jack Heise**
*Pro Hac Vice motion forthcoming*
**Jonathan E. DeWitt**
DC Bar No. 90004853 (active)
*Pro Hac Vice motion forthcoming*
LEHOTSKY COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
mike@lehotskycohn.com
rick@lehotskycohn.com
jack@lehotskycohn.com
jdewitt@lehotskycohn.com